# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>
DIANA ALLEN and D. ALLEN<br>
ENTERPRISES, LLC, Individually<br>
and On Behalf of All Others Similarly<br>
Situated,<br>
<br>
        Plaintiffs,<br>
<br>
        v.<br>
<br>
CLAIRE R. HARVEY, WILLIAM D.<br>
ANDERSON, ERIK C. BELZ,<br>
BRYAN C. GUNDERSON, MARK<br>
C. HENLE, ALAN J. HIRSHBERG,<br>
ADAM M. JENKINS, STEVEN R.<br>
JONES, FALCON MINERALS<br>
CORPORATION, DPM HOLDCO,<br>
LLC, INC., and FALCON<br>
MINERALS OPERATING<br>
PARTNERSHIP, LP,<br>
<br>
        Defendants.
</td><td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td><td>
C.A. No. 2022-0248-MTZ
</td></tr>
</table>

## MEMORANDUM OPINION

Date Submitted: July 13, 2023
Date Decided: October 30, 2023

Peter B. Andrews, Craig J. Springer, David M. Sborz, Andrew J. Peach, Jackson E. Warren, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Joshua Fruchter, WOHL & FRUCHTER LLP, Monsey, New York, *Attorneys for Plaintiffs Diana Allen and D. Allen Enterprises, LLC*.

Tammy L. Mercer, James M. Yoch, Jr., Michael A. Laukaitis II, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Craig Zieminski, Andy Jackson, Jeremy Gonzales, VINSON & ELKINS, LLP, Dallas, Texas, *Attorneys for Defendants*.

**ZURN, Vice Chancellor.**

This opinion resolves a dispute over the corporate benefit afforded by, and the fee inspired by, supplemental disclosures in advance of a stockholder vote. Delaware law offers recent guidance on the standard for gauging the benefit from those disclosures and the fee that should be awarded. This case presents the opportunity to gauge what amounts to an "extraordinary" supplemental disclosure warranting a proportionately extraordinary fee. This opinion concludes that disclosures identifying conflicts held by a special committee's chair and advisors are, without more, not extraordinary. But the disclosures of those conflicts in response to these plaintiffs' suit are meaningfully beneficial and warrant a proportionate fee.

## I. BACKGROUND[1]

Defendant Falcon Minerals Corporation ("Falcon") is the product of a 2018 transaction in which Osprey Energy Acquisition Corporation merged with subsidiaries of a subsidiary of The Blackstone Group L.P. ("Blackstone").[2] Blackstone "became Falcon's largest stockholder"[3] and entered into a shareholders'

---

[1] I draw all facts from the plaintiffs' pleadings and documents integral thereto. Citations in the form of "Compl." refer to the plaintiffs' Verified Class Action Complaint, available at docket item ("D.I.") 1. Citations in the form of "Proxy" refer to Falcon's Schedule 14A, filed February 9, 2022, available at D.I. 1, Ex. A. Citations in the form of "Amended Proxy" refer to Falcon's Schedule 14A, filed March 25, 2022, available at D.I. 15, Ex. 1.

[2] Compl. ¶¶ 25–26.

[3] *Id.* ¶ 27.

agreement with Falcon that gave Blackstone a right to designate six out of nine members of Falcon's board ("the Falcon Board").[4] Initially, Blackstone held a 47% voting interest in Falcon;[5] by 2021, Blackstone owned a 40.4% voting interest in Falcon, and had direct relationships with five of the eight members of the Falcon Board.[6] Falcon's March 2021 Form 10-K disclosed that "Blackstone [has] significant influence over [Falcon]" and that "as long as our Sponsor [Blackstone] and the Contributors own or control a significant percentage of [Falcon's] outstanding voting power, subject to the terms of the Shareholders' Agreement, they will have the ability to influence corporate actions requiring stockholder approval."[7]

In August 2021, Falcon began evaluating a merger transaction with "certain affiliates of Blackstone."[8] The Falcon Board "approved the engagement of Citi as Falcon's financial advisor in connection with its ongoing evaluation . . . aimed at maximizing stockholder value."[9] Citi advised Falcon in evaluating several transactions and opportunities.[10]

---

[4] Proxy at 114.

[5] Compl. ¶ 27.

[6] *Id.* ¶ 29.

[7] *Id.* ¶ 28 (quoting Falcon Annual Report (Form 10-K) at 25 (March 12, 2021)).

[8] Proxy at 119.

[9] *Id.* at 116.

[10] *See id.* at 115–19.

Desert Peak, LLC submitted a proposal to merge with Falcon. Blackstone had acquired a 20% ownership interest in Desert Peak in June.[11] Desert Peak and Falcon would eventually merge (the "Merger"). Falcon's disclosures to its stockholders about its negotiations with Desert Peak, and the extent to which those negotiations were independent of Blackstone, are at the heart of this case.

When negotiations began with Desert Peak, "[g]iven Blackstone's ownership interests in Desert Peak, the Falcon Board . . . deemed it prudent to reactivate [its] Transaction Committee to assess any potential acquisition of the Company . . . and the business combination proposal received from Desert Peak."[12] According to the Proxy, the "special committee [was] comprised solely of disinterested directors,"[13] and specifically "consist[ed] of Claire Harvey, William Anderson and Steven Jones, each of whom were independent and disinterested directors."[14] Falcon stated nine times in the Proxy that Transaction Committee members were "disinterested."[15] Falcon also told its stockholders that "each of the members of the Transaction

---

[11] Compl. ¶ 32.

[12] Proxy at 121.

[13] *Id.* at 4; *see id.* at 8; *see also id.* at 15, 145, 241.

[14] *Id.* at 119.

[15] *See id.* at 4, 8, 15, 119, 130, 145, 436.

Committee is a disinterested member of the Falcon Board, which allows for an independent evaluation" of the Merger.[16]

The Transaction Committee engaged financial advisors other than Citi for the Desert Peak transaction. The Proxy explained, "[g]iven Citi's role as financial advisor to [Desert Peak], the Transaction Committee discussed potential additional financial advisors to assist the Transaction Committee and selected Barclays Capital, Inc. ('Barclays')."[17] The Transaction Committee "retained Houlihan Lokey Capital, Inc. ('Houlihan Lokey') to provide its opinion as to the fairness, from a financial point of view, to Falcon of the Merger consideration,"[18] and to provide an "evaluation of Desert Peak's proposal."[19]

On January 11, 2022, Falcon entered into an agreement to merge with Desert Peak.[20] The Merger would result "in Desert Peak equity holders, plus affiliates of Blackstone that own interests in both Falcon and Desert Peak, owning 86% of the post-Merger company."[21]

---

[16] *Id.* at 130.

[17] *Id.* at 119.

[18] *Id.* at 29.

[19] *Id.* at 121.

[20] *Id.* at 1.

[21] Compl. ¶ 37.

4

Falcon filed the Proxy on February 9. The Proxy outlines the "Reasons for the Transaction Committee's Recommendation" to approve the Merger, providing a list of fifteen factors and six procedural safeguards that the Transaction Committee believed "weighed in favor of the Merger."[22] The Transaction Committee highlighted "the fact that the holders of approximately 40.4% of the outstanding Falcon Common Stock were willing to enter into the Support Agreement committing such holders to vote to approve the Proposals, which significantly reduces deal uncertainty."[23] Blackstone owned 40.4% of Falcon's outstanding common stock at the time.[24] The Proxy next highlighted two procedural safeguards: the disinterestedness of the Transaction Committee, and that committee's selection of "its own legal and financial advisors."[25]

On March 15, plaintiffs Diana Allen and D. Allen Enterprises, LLC (collectively, "Plaintiffs") sued to enjoin the Merger on the basis that Falcon's Proxy was materially misleading.[26] The Complaint alleged three omissions.[27] The first pertains to the failure to disclose Harvey's affiliation with Blackstone. The Proxy

[22] Proxy at 129–30.

[23] *Id.* at 130.

[24] *Id.* at 114, 130, 238.

[25] *Id.* at 130.

[26] Compl. ¶¶ 40–42.

[27] *Id.* ¶ 6.

5

characterized Harvey as disinterested in and independent of Blackstone. It disclosed that "[f]rom May 2019 to August 2020 . . . , she led Gryphon Oil and Gas, LLC ("Gryphon"), a private equity-sponsored company."[28] Plaintiffs complained the Proxy failed to disclose that "[1] Blackstone was the sole private equity sponsor of Gryphon, which Harvey not only led but founded and that [2] three members of Gryphon's management team serving under Harvey's leadership were Blackstone executives, including Falcon director Erik C. Belz."[29]

Plaintiffs also addressed the Proxy's failure to disclose the Transaction Committee's financial advisors' affiliation with Blackstone.[30] The Proxy disclosed the Transaction Committee retained Barclays and Houlihan Lokey for the Desert Peak transaction as replacements for Citi because of Citi's relationship with Desert Peak and Blackstone. Plaintiffs claim these statements required Falcon to further disclose that (1) "Barclays was providing services to Blackstone *while advising the Transaction Committee*,"[31] (2) "from January 1, 2018 through November 22, 2021, Barclays received approximately $224.8 million in investment banking fees from Blackstone,"[32] (3) "around two weeks after the Board issued the Proxy, Blackstone

---

[28] Proxy at 229.

[29] Compl. ¶ 6.

[30] *Id.*

[31] *Id.* ¶ 48 (emphasis added).

[32] Amended Proxy at 158; *see* Compl. ¶ 49.

6

announced the pricing of a $547 million collateralized loan obligation via Barclays,"[33] and (4) Houlihan Lokey received significant fees from Blackstone engagements.[34]

On March 25 and April 14, Falcon filed four corrective disclosures:

[1] From May 2019 to August 2020, [Harvey] led Gryphon Oil and Gas, LLC ("Gryphon"), a Blackstone-sponsored company focused on acquiring non-operated interests in the Permian Basin. [2] From May 2019 to August 2020, [Harvey] led Gryphon Oil and Gas, LLC ("Gryphon"), a Blackstone-sponsored company focused on acquiring non-operated interests in the Permian Basin, whose management included two senior Blackstone executives and fellow Falcon director and Blackstone Managing Director Erik C. Belz. [3] During the two years preceding the date of Houlihan Lokey's written opinion, Houlihan Lokey has been engaged by or otherwise performed services for certain affiliates of Falcon and Desert Peak . . . . For these . . . services, in the previous two years, Houlihan Lokey has received, fees of approximately $14.2 million in the aggregate. . . . [4] In connection with the proposed transaction, Barclays advised the Falcon Board that it and its affiliates have provided, currently are providing and in the future expect to provide, investment banking services for Blackstone and certain of its affiliates and portfolio companies . . . . Barclays has received approximately $224.8 million in investment banking fees from Blackstone.[35]

---

[33] Compl. ¶ 48.

[34] *Id.* ¶¶ 44–45.

[35] Amended Proxy at 115, 155–56, 247.

The corrective disclosures mooted Plaintiffs' claims, and they dismissed their claims but requested a $600,000 fee award. The parties were not able to agree on a fee award and have submitted it for my consideration.

## II. ANALYSIS

Litigants are generally responsible for paying their own attorneys' fees and expenses. But Delaware courts recognize certain exceptions to that American Rule, such as the corporate benefit doctrine.[36] Under the corporate benefit doctrine, "the Court may order the payment of counsel fees and related expenses to a plaintiff whose efforts result in the . . . conferring of a corporate benefit."[37] Before doing so, the plaintiff must demonstrate: "(1) the suit was meritorious when filed, (2) the defendants took an action that produced a corporate benefit before the plaintiffs obtained a judicial resolution, and (3) the suit and the corporate benefit were causally related."[38]

One application of the corporate benefit doctrine, the mootness exception to the American Rule, permits awarding attorney's fees "when claims have been mooted . . . because of action taken by the defendants, and the action taken by the defendants that rendered the claim moot simultaneously created the corporate benefit

---

[36] *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *7 (Del. Ch. Oct. 28, 2010).

[37] *Tandycrafts v. Initio P'rs*, 562 A.2d 1162, 1164 (Del. 1989).

[38] *EMAK Worldwide v. Kurz*, 50 A.3d 429, 432 (Del. 2012).

8

that the plaintiff had [sought] and for which the plaintiff was entitled to have its attorney's fees paid."[39] "Under the 'mootness rule,' when a defendant took an action after the suit was filed that mooted a claim, there is a rebuttable presumption the suit and the benefit were causally related . . . ."[40] Defendants have the burden of "rebutting the presumption by demonstrating that the lawsuit did not in any way cause their action."[41]

This Court has carefully addressed fees for mooting disclosure claims over the past several years, with its focus heightened by the observation that "seeking to resolve disclosure claims in deal litigation through a Court-approved settlement" is a "suboptimal path" that threatens divergence from the purpose of the "historically trodden" corporate benefits exception and risks payment for settlements that do not obtain real stockholder value.[42] As recently enunciated in *Anderson v. Magellan Health*, in order to support a mootness fee, the disclosures must be "plainly material" to stockholders, meaning whether "there is a substantial likelihood that a reasonable

---

[39] *Crothall v. Zimmerman*, 94 A.3d 733, 738 (Del. 2014).

[40] *EMAK Worldwide*, 50 A.3d at 433.

[41] *United Vanguard Fund v. TakeCare, Inc.*, 693 A.2d 1076, 1080 (Del. 1997).

[42] *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 898 (Del. Ch. 2016); *see id.* at 895–96 (citations omitted).

shareholder would consider [the information] important in deciding how to vote"[43] "should not [even] be a close call."[44]

"In addition to determining a movant's entitlement to a mootness fee, the court must make an independent determination of reasonableness of the amount requested."[45] In so doing, I am guided by the well-known factors set out in *Sugarland Industries, Inc. v. Thomas*[46] and by precedent awards concerning the value of the supplemental disclosures.[47]

Here, the parties do not dispute that Plaintiffs' suit and the supplemental disclosures were causally related. They dispute the disclosures' materiality and the fee to be awarded if they are material. For the following reasons, I find the disclosures were plainly material, and I grant Plaintiffs' petition for an award of attorneys' fees, but not in the full amount requested.

---

[43] *Trulia*, 129 A.3d at 899.

[44] *Anderson v. Magellan Health*, 298 A.3d 734, 746 (Del. Ch. 2023) (quoting *Trulia*, 129 A.3d at 898).

[45] *Id.* at 740 (quotation marks omitted).

[46] *Id.* ("To assess the reasonableness of a fee award, this Court follows the *Sugarland* factors.").

[47] *Id.* at 744 (cautioning that pre-*Trulia* precedent is less useful in determining the value of otherwise comparable benefits and that pre-*Trulia* precedent pricing corporate benefits often reflects inflated valuations).

10

### A. Materiality

When considering whether the plaintiff successfully demonstrated "the suit was meritorious when filed,"[48] I review the disclosures with a "defendant-friendly" perspective.[49] "A claim is meritorious . . . if it can withstand a motion to dismiss on the pleadings."[50] To obtain a mootness fee, the plaintiff must also demonstrate the action "specifically and substantially benefit[ted] the corporation and its stockholders to warrant fees."[51]

The same materiality standard governs both the merit of the claim and the corporate benefit from mooting it.[52] Supplemental disclosures that are not plainly material will be "screen[ed] out."[53] Information is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[54] A reasonable stockholder would find supplemental information to be

---

[48] *Id.* at 740.

[49] *Id.* at 746–47.

[50] *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 636 (Del. Ch. June 6, 2005).

[51] *Garfield v. Boxed, Inc.*, 2022 WL 17959766, at *10 (Del. Ch. Dec. 27, 2022) (internal quotation marks omitted).

[52] *Magellan*, 298 A.3d at 746.

[53] *Id.* at 749.

[54] *Trulia*, 129 A.3d at 899 (quoting *Rosenblatt v. Getty Oil*, 493 A.2d 929, 944 (Del. 1985)).

important when "it significantly alters the total mix of information made available."[55]

"When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts."[56] Omitted facts may become material when a partial and incomplete disclosure of otherwise immaterial information chances obstructing "the stockholders [from] draw[ing] the complete picture."[57] In other words, if disclosures "traveled down the road of partial disclosure," the authors had "an obligation to provide the stockholders with an accurate, full, and fair characterization" of the transaction landscape.[58] "If

---

[55] *Id.* (internal quotation marks omitted).

[56] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. Sept. 27, 2002).

[57] *In re Om Group, Inc. S'holders Litig.*, 2016 WL 5929951, at *12 (Del. Ch. Oct. 12, 2016) ("[A] partial and incomplete disclosure of arguably immaterial information regarding the history of negotiations leading to a merger might result in a materially misleading disclosure if not supplemented with information that would allow the stockholders to draw the complete picture."); *see also Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1281 (Del. 1994) (agreeing with the Vice Chancellor that, "as an abstraction, Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information" but disagreeing with the Vice Chancellor's holding that such information was immaterial, "under the circumstances of this case, which involve[d] a partial and incomplete disclosure of historical information").

[58] *Arnold*, 650 A.2d at 1281; *see also Lynch v. Vickers Energy*, 383 A.2d 278, 281 (Del. 1977) (holding defendants violated their disclosure obligations when they partially disclosed a reliable "floor" asset valuation but did not disclose an equally reliable "ceiling" value); *Freedman v. Rest. Assoc. Indus.*, 1990 WL 135923, at *8 (Del. Ch. Feb. 27, 1990) (holding that while management has "no general obligation to disclose its purposes or motivation, once it undertook to disclose its purpose in revising the offer, it had an obligation to do so truthfully and candidly.").

12

[the board] believed that one [perspective] was more accurate or realistic than another, it was free to endorse that [perspective] and to explain the reason for doing so; but full disclosure . . . was a prerequisite."[59]

In soliciting stockholder votes on the Merger, the Proxy repeatedly touted the transaction's independence from Blackstone, and painted the Merger as having been negotiated and advised by wholly independent fiduciaries and advisors. The Proxy explained that the Transaction Committee's existence and its retention of advisors other than Citi were designed to ensure independence from Blackstone.[60] But the Proxy failed to tell the full story about the independence of the Transaction Committee's chair and advisors.[61]

---

[59] *Lynch*, 383 A.2d 278 at 281.

[60] Proxy at 16 ("Falcon's directors and officers may have interests in the Merger that are different from your interests as a stockholder. For instance, half of the members of the Falcon Board were designated by and are affiliated with Royal Resources, an affiliate of Blackstone, Inc., and Rock Ridge, another affiliate of Blackstone, Inc., is a current equity holder in Desert Peak."); *id.* at 121 ("Given Blackstone's ownership interests in Desert Peak, the Falcon Board . . . deemed it prudent to reactivate [its] Transaction Committee to assess any potential acquisition of the Company . . . and the business combination proposal received from Desert Peak."); *id.* at 130 ("[T]he Transaction Committee considered a number of factors relating to the procedural safeguards involved in the negotiation of the Merger Agreement, including . . . [e]ach of the members of the Transaction Committee is a disinterested member of the Falcon Board, which allows for an independent evaluation of potential strategic transactions, [and] [t]he Transaction Committee selected and retained its own legal and financial advisors . . . .").

[61] The obligation to tell the whole truth in the Proxy stems, at a minimum, from its partial truths about independence from Blackstone and the confidence that independence should inspire in the Merger. I do not reach whether Blackstone was a controller.

13

After promoting the disinterestedness of the Transaction Committee and its members, and then declaring it as a reason for voter confidence, any undisclosed information weighing against the disinterestedness of the committee, its members, and its advisors "was extremely relevant to a reasonable stockholder's" decisionmaking.[62] Having been assured of their independence from Blackstone, a reasonable stockholder would have wanted to know about the connections of Harvey, Barclays, and Houlihan Lokey to Blackstone in deciding how to vote on the Transaction.

### 1. The Transaction Committee Chair

The Proxy states that Falcon created the Transaction Committee because Blackstone may sit on both sides of the deal and because several Falcon board members were potentially conflicted due to their ties to Blackstone.[63] It repeatedly held out each member of the special committee as disinterested and independent.[64]

---

[62] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1057 (Del. 1996) ("In light of the partial disclosure, the undisclosed [information] was extremely relevant to a reasonable stockholder's valuation of the corporation.").

[63] Proxy at 121 ("Given Blackstone's ownership interests in Desert Peak, the Falcon Board . . . deemed it prudent to reactivate the Transaction Committee to assess any potential acquisition of the Company . . . ."); *see also id.* at 27 ("Falcon's directors and officers may have interests in the Merger that are different from your interests as a stockholder. For instance, half of the members of the Falcon Board were designated by and are affiliated with Royal Resources, an affiliate of Blackstone, Inc., and Rock Ridge, another affiliate of Blackstone, Inc., is a current equity holder in Desert Peak.").

[64] *See id.* at 4, 8, 15, 119, 130, 145, 436.

14

It characterized Harvey, the chair of the Transaction Committee, as independent of Blackstone.[65] It also provided the stockholders with a sketch of her qualifications.[66] Finally, the Proxy identified the Transaction Committee's independence as an implied, if not explicit, justification for stockholder approval.[67]

Having been told Harvey was independent from Blackstone, Falcon's stockholders were entitled to know of her ties to Blackstone. This Court has found that a chair's conflicts can render her unfit for service on a special committee intended to assure independence.[68]

> Where omitted information goes to the independence or disinterest of directors who are identified as the company's "independent" or "not interested" directors, the relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made.[69]

---

[65] *Id.* at 4 ("[The] special committee [was] comprised solely of disinterested directors."); *see id.* at 130 ("[The special committee] consist[ed] of Claire Harvey, William Anderson and Steven Jones, each of whom were independent and disinterested directors.").

[66] *Id.* at 229 ("From May 2019 to August 2020 . . . , she led Gryphon Oil and Gas, LLC, a private equity-sponsored company.").

[67] *Id.* at 4 ("The board of directors of Falcon upon the unanimous recommendation and approval of a special committee comprised solely of disinterested directors . . . recommends that [the stockholders] vote or give instruction to vote 'FOR' each of those proposals.").

[68] *In re Loral Space & Commc'ns*, 2008 WL 4293781, at *22 (Del. Ch. Sep. 19, 2008) (finding the chairperson's friendship with the Company's large stockholder and interested acquirer prevented him from being disinterested and independent, and that those relationships "were too substantial to make him a fit member of the Special Committee, much less Chairman").

[69] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 22 (Del. Ch. Feb. 28, 2014) (internal quotation marks omitted) (finding special committee members'

15

Information pertaining to Harvey's potential conflicts, given her role as the purportedly independent chair of the Transaction Committee, is material. The Proxy's sketch of Harvey's leadership role in Gryphon was incomplete: it failed to detail that Blackstone was the sole private equity sponsor of Gryphon, which Harvey not only led but founded.[70] It further failed to disclose that "three members of Gryphon's management team serving under Harvey's leadership were Blackstone executives, including Falcon director Erik C. Belz."[71] The failure "to disclose or describe [Harvey's] relationship to [Blackstone] renders the proxy statements materially misleading and incomplete."[72]

### 2. The Transaction Committee's Advisors

Plaintiffs also asserted the Proxy failed to disclose the Transaction Committee's chosen advisors had relationships with Blackstone and the advisors' revenue from those relationships.

---

"prior . . . relationships" with a controller "should have been disclosed" because of the committee's "role as negotiators on behalf of the minority stockholders").

[70] *See* D.I. 12 at Op. Br. [hereinafter "Op. Br."] 7, 12.

[71] *See id.*

[72] *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I*, 824 A.2d 11, 15 (Del. Ch. Dec. 19, 2002).

16

Financial advisor conflicts are material and must be disclosed to stockholders.[73] "The financial advisor's opinion of financial fairness for a proposed transaction is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders and, in turn, for the stockholders' decisions on the appropriateness of the transaction."[74] "Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, [stockholders are entitled to] full disclosure of investment banker compensation and potential conflicts."[75] In *Rodden v. Bilodeu*, this Court found that "the omitted fact that [the target] and [the acquirer] paid Barclays north of $9 million in the two years before the merger" was "material

---

[73] *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del. Ch. June 27, 2008) (describing information about potentially conflicting influences on financial advisors' analytical efforts as "imperative for the stockholders to be able to understand what factors might influence the financial advisor's [analysis]"); *see also In re PAETEC Hldg. Corp. S'holders Litig.*, 2013 WL 1110811, at *7 (Del. Ch. Mar. 19, 2013) ("The materiality of a disclosure of a conflicted financial advisor does not necessarily depend on whether the conflict actually harmed the sales process."); *In re John Q. Hammons Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2009) ("There is no rule . . . that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict."); *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *11 (Del. Ch. Mar. 31, 2017) (declaring that potential conflicts of financial advisors must be disclosed: "the Board was obliged to disclose potential conflicts of interest of its financial advisors' so that stockholders could decide for themselves what weight to place on a conflict faced by the financial advisor this has not been, and cannot be, disputed.") (internal quotation marks omitted)).

[74] *Margolis*, 2008 WL 5048692, at *8; *see also* Proxy at 29 ("[The Transaction Committee] retained Houlihan Lokey Capital, Inc. to provide its opinion as to the fairness, from a financial point of view, to Falcon of the Merger consideration.").

[75] *PAETEC*, 2013 WL 1110811, at *7 (internal quotation marks omitted).

17

because its disclosure helped [target] stockholders to contextualize the magnitude of Barclays' potential conflict of interest."[76]

Like the assurances that the Transaction Committee's chair was independent, the Proxy communicated that the Transaction Committee was "adequately empowered" "to freely select its own advisors," and that those advisors were disinterested and independent.[77] It disclosed that the Transaction Committee replaced Citi because it was Desert Peak's financial advisor, and went on to retain Barclays and Houlihan Lokey.[78] It touted these actions as procedural safeguards for ensuring a disinterested and independent evaluation of the Merger.[79] The Proxy identified Citi's potential conflict, then assured stockholders of the neutrality of the Transaction Committee's replacement advisors.

Omitting those advisors' conflicts was materially misleading. The Proxy failed to disclose that "Barclays was providing services to Blackstone while advising the Transaction Committee," and that Barclays' services to Blackstone netted it

---

[76] *Rodden v. Bilodeu*, C.A. No. 2019-0176-JRS, at 21 (Del. Ch. Jan. 27, 2020) (TRANSCRIPT).

[77] *Kahn v. M & F Worldwide*, 88 A.3d 635, 644, 645 (Del. 2014).

[78] Proxy at 119 ("Given Citi's role as financial advisor to [Desert Peak], the Transaction Committee discussed potential additional financial advisors to assist the Transaction Committee and selected Barclays Capital, Inc. ('Barclays').").

[79] *Id*.

18

hundreds of millions of dollars.[80]  It also failed to disclose that Houlihan Lokey, retained to provide a fairness opinion, received $14.2 million in fees from Blackstone engagements.[81]  This information would certainly help Falcon stockholders contextualize the financial advisors' potential conflict of interest.[82]  "A more balanced disclosure . . . would have significantly altered the total mix of information available to the individual . . . stockholder."[83]

Having established that the omitted disclosures were plainly material, it follows that Falcon's four supplemental disclosures, filling in the Proxy's misleading omissions regarding the independence of the Transaction Committee's chair and advisors, conferred a corporate benefit.  The "stockholders were entitled to know the omitted information in order to judge for themselves [Harvey's and the financial advisors'] independence and disinterestedness."[84]  The four disclosures fulfilled that entitlement and provided information that materially informed the stockholder vote on a potentially conflicted transaction.  The disclosures conferred a meaningful benefit on the Company and its stockholders.

---

[80] Op. Br. 7, 16.

[81] *See* Compl. ¶¶ 44–45; *see also* Amended Proxy at 158.

[82] Op. Br. 19.

[83] *Zirn*, 681 A.2d at 1057 (internal quotation marks omitted).

[84] *Millenco*, 824 A.2d at 18.

## B. Reasonableness Of Amount Requested

Because Plaintiffs' lawsuit was meritorious when filed, and Falcon's actions in response to the lawsuit conferred a substantial corporate benefit, "the Court should award reasonable attorneys' fees and expenses incurred by the plaintiff in achieving the benefit."[85] Plaintiffs request a fee and expense award of "at least $600,000,"[86] including reimbursement for $5,742.95 in expenses.[87]

"The amount of attorneys' fees award in a corporate benefit case is a discretionary determination for this Court."[88] As guidance, "the Court considers the factors set forth in *Sugarland*."[89] Of the seven factors, "the size [or value] of the benefit conferred"[90] is the most determinative factor.[91] "Precedent awards from

---

[85] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1255 (Del. 2012) ("When the efforts of a plaintiff on behalf of a corporation result in the creation of a common fund, the Court should award reasonable attorneys' fees and expenses incurred by the plaintiff in achieving the benefit.") (citation omitted).

[86] Op. Br. 22.

[87] *Id.* at 29 (calculating "a total lodestar of $106,065.70" and "an approximate multiplier of 5.6 on Plaintiffs' counsel's . . . total lodestar amount").

[88] *Ind. Elec. Workers Pension Tr. Fund, IBEW v. Covetrus* [hereinafter *Covetrus Tr.*], C.A. No. 2020-0923-PAF, at 64 (Del. Ch. Jun. 15, 2021) (TRANSCRIPT).

[89] *Id.*

[90] *In re Plains Res.*, 2005 WL 332811, at *3 ("The factors are: (i) the amount of time and effort applied to the case by counsel for the plaintiffs; (ii) the relative complexities of the litigation; (iii) the standing and ability of petitioning counsel; (iv) the contingent nature of the litigation; (v) the stage at which the litigation ended; (vi) whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof; and (vii) the size of the benefit conferred.").

[91] *Ams. Mining Corp.*, 51 A.3d at 1255 (finding the benefit achieved to be "the first and most important of the *Sugarland* factors").

similar cases may be considered for the obvious reason that like cases should be treated alike."[92]

## 1. Value of the Benefit Conferred

"All supplemental disclosures are not equal. To quantify an appropriate fee award, this Court evaluates the qualitative importance of the disclosures obtained."[93] *In re Sauer-Danfoss Inc. Shareholders Litigation* divided mootness fee awards for disclosures of material information into three strata: minimally beneficial disclosures, meaningfully beneficial disclosures, and exceptionally beneficial disclosures.[94] While the numerical fees awarded for the top two categories have been ratcheted downward after *Trulia*, the categories *Sauer-Danfoss* established remain relevant.[95] As observed in *Anderson v. Magellan Health*, post-*Trulia*, the

---

[92] *Olson v. ev3*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011).

[93] *In re Compellent Techs.*, 2011 WL 6382523, at *26 (Del. Ch. Sept. 15, 2011) (quoting *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1136 (Del. Ch. May 3, 2011)).

[94] 65 A.3d at 1141–43.

[95] *See* Hao Jiang, *Enforcing the Bargain v. Materiality Requirement the Future of Disclosure Only Settlements Post-Trulia*, 38 Pace. L. Rev. 569, 597 (2018) ("The *Sugarland* factors do not provide an effective tool for the Chancery Court to quantify an appropriate award given the fact that disclosure is 'an intangible, non-quantifiable benefit.' Nevertheless, the Court has developed a three-scale system in *Sauer-Danfoss* that measures the benefits conveyed by the disclosures and places each case on a scale based on the quality of the disclosures and looks to 'fee awards granted for similar disclosures.'" (quoting *In re Sauer-Danfoss Inc. S'holder Litig.*, 65 A.3d 1116, 1136 (Del. Ch. 2011)); *see also* Sean J. Griffith, Anthony A. Rickey, *Objections to Disclosure Settlements: A How-To Guide*, 70 Okla. L. Rev. 281, 313 (2017) ("[A]nother good source for context in disclosure fee awards is Vice Chancellor Laster's opinion in *In re Sauer-Danfoss Inc. Shareholders Litigation . . .* , [which] collects many disclosure settlements, separating them

---

"high end" or upper bound for material disclosures is $450,000,[96] but disclosures that are exceptionally valuable or obtained in "[e]xceptional circumstances" can draw $600,000.[97] Both before and after *Trulia*, minimally beneficial disclosures have consistently been valued at $75,000.[98] Plaintiffs here seek an award of $600,000, on the grounds that, under *Magellan*, the disclosures they obtained are exceptionally beneficial.[99]

### a. Exceptionally Beneficial Disclosures

*Magellan* offers *Indiana Electrical Workers Pension Trust Fund, IBEW v. Covetrus* as an example of a disclosure made in "exceptional circumstances" warranting a $600,000 fee.[100] In *Covetrus*, "the company sold $250 million of convertible stock to a third party" who would hold "25% of the voting power in

---

into three categories based upon the value of the supplemental disclosures to stockholders, the degree of investigation and litigation conducted in the case, and the fee award.").

[96] *Magellan*, 298 A.3d at 750 (quoting *Bednar v. Cleveland Biolabs*, 2023 WL 3995121, at \*5 (Del. Ch. June 13, 2023)).

[97] *Id.* at 750 n.81 (citing the $600,000 fee award in *Indiana Electrical Workers Pension Trust Fund, IBEW v. Covetrus*, C.A. No. 2020-0923-PAF, at 70 (Del. Ch. Jun. 15, 2021) (TRANSCRIPT), as being based on exceptional circumstances).

[98] *Id.* at 750 (pegging "marginally helpful" disclosures post-*Trulia* at $75,000).

[99] D.I. 24 at 6, 29–31 (arguing the disclosures Plaintiffs caused are more beneficial than those *Magellan* identified as "exceptional").

[100] *Magellan*, 298 A.3d at 750 n.81 (citing the disclosures earned in *Covetrus* as exceptionally valuable); *Covetrus Tr.* at 63–64 (finding "the supplemental disclosure removed a potential[ly] coercive aspect of the disclosure," without which removal "stockholders may have been deterred from participating in a vote in which the outcome was already heavily weighted one way").

Covetrus" if all the stock was converted.[101] But "granting 25% voting power in one step would have required a prior stockholder vote under NASDAQ rules."[102] To comply with NASDAQ rules, the company had to pause conversion at 19.99% and seek stockholder approval to convert the rest, and the third party could not vote its converted 19.99% to approve the rest of its conversion.[103] The disclosures in connection with a vote on converting the remainder of the third party's stock made it appear as if the third party was voting its previously converted stock, against NASDAQ rules. And so, the stockholders were left to assume "the deal was already heavily weighted one way," which chanced chilling voter participation.[104] Thus, the omission had a "coercive aspect."[105] Supplemental disclosures "corrected the proxy's allegedly materially misleading disclosure that the previously converted shares would be eligible to vote on the second conversion proposal."[106] These disclosures decreased the "portrayal of a largely inevitable outcome," and thereby increased stockholders' "incentive to participate in the vote."[107] This supplemental

---

[101] *Magellan*, 298 A.3d at 750 n.81.

[102] *Id.*

[103] *Covetrus Tr.* at 56, 61.

[104] *Magellan*, 298 A.3d at 750 n.81.

[105] *Covetrus Tr.* at 63 (finding "the supplemental disclosure removed a potentially coercive aspect of the disclosure," without which removal "stockholders may have been deterred from participating in a vote in which the outcome was already heavily weighted one way").

[106] *Id.* at 63.

[107] *Id.* at 63–64, 68; *Magellan*, 298 A.3d at 750 n.81.

23

disclosure was exceptional because it vindicated the stockholder franchise not only by providing more information, but also by eliminating coercion.[108]

From *Magellan*'s treatment of *Covetrus*, I conclude that a supplemental disclosure offers exceptional value when it not only provides additional information to stockholders, but also removes real or perceived restrictions on voter participation. Such a disclosure does more than simply tell stockholders the material information they deserve in order to vote: it restores meaning and autonomy to that vote. Like any other measure restoring voter participation or eliminating obstacles to meaningful participation, such a disclosure is exceptionally valuable.

Post-*Trulia* cases have also awarded attorneys' fees over $450,000 where transaction disclosures provide stockholders with supplemental information about process problems resulting from side-straddling controllers.[109] In *In re Medley*

---

[108] *Covetrus Tr.* at 62–64, 67.

[109] *E.g.*, *Hollywood Firefighters' Pension Fund v. Malone*, 2021 WL 5179219, at *8 (Del. Ch. Nov. 8, 2021) (considering disclosures of "conflicts regarding financial advisors as well as special committee members," where those conflicts manifested in personal benefits to the conflicted directors and diminished minority shareholder merger consideration); *In re Medley Cap. Corp. S'holders Litig.*, C.A. No. 2019-0100-KSJM, at 63 (Del. Ch. Nov. 19, 2019) (TRANSCRIPT) (awarding $500,000 in attorneys' fees for five disclosures regarding conflicted controllers and an infected special committee and transaction process); *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *5 (Del. Ch. June 27, 2011) (disclosing that an advisor secured a "sell-side advisory business and a lucrative buy-side financing role," then "secretly and selfishly manipulated the sale process to engineer a transaction" to its own benefit); *In re ArthroCare S'holder Litig.*, C.A. No. 9313-VCL, at 28 (Del. Ch. Nov. 6, 2014) (TRANSCRIPT) (considering disclosures that J.P. Morgan negotiated a deal between ArthroCare, in which it held a 17% equity stake and

24

*Capital Corporation Shareholders Litigation,*[110] this Court found the proposed transactions triggered entire fairness review because the "special committee was beholden to [the conflicted controllers]," the conflicted controllers set an aggressive timeline and "dominated . . . the board with respect to the proposed transaction," and "the deal protections of the merger agreement . . . fail[ed] enhanced scrutiny."[111] But facially, "the process appeared arm's-length," and the "proxy recommending that the stockholders approve the proposed transactions certainly made it seem that way."[112] "[C]ritical fact[s]"[113] were omitted from the proxy, other disclosures were incomplete, and one was "outright false."[114] And so, the Court declared that for the stockholder vote to have any meaning, "the stockholders must know the reality."[115]

---

two board seats, and Smith & Nephew, to whom it was an advisor, at a low premium to stockholders but for a substantial fee, and noting that "the disclosure claims were much stronger than the usual case and related to conflicts on the part of the acquirer's financial advisor and financing source" that went "beyond what [was seen] in . . . *Del Monte*") (citing *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256 (Del. Ch. June 27, 2011)).

[110] This case was tried under the name *FrontFour Cap. Grp. v. Taube* and was consolidated post-trial under *In re Medley Capital Corporation Shareholders Litigation.* The post-trial memorandum opinion retains the former case name, and the transcript ruling for the award of attorneys' fees retains the latter. Collectively, I reference the action under its consolidated name.

[111] *FrontFour Cap. Grp. v. Taube*, 2019 WL 1313408, at *2 (Del. Ch. Mar. 11, 2019).

[112] *Id.*

[113] *Id.* at *29 (describing one of the several proxy omissions as a "critical fact" that would impact the voter assessment of the quality of the transaction process).

[114] *Id.* at *3.

[115] *Id.*

The Court enjoined defendants from consummating the transaction pending corrective disclosures.[116]

In post-trial negotiations, the plaintiffs obtained the desired disclosures. An August 30 settlement notice disclosed: (1) "the existence of proposals for an alternative transaction" from three outside bidders, (2) "that the special committee had not been made aware of the existence of the standstills prior to the execution of the original merger agreement," (3) "that plaintiffs proved that half of the special committee was beholden to the [controllers]," (4) "that plaintiffs proved the [controllers] dominated . . . the board," and (5) "that [the Court] found the enjoined transactions were not entirely fair to Medley Capital's stockholders."[117] The Court approved the settlement and also awarded attorneys' fees in the exceptional range for such disclosures,[118] concluding that "$500,000 is [a] reasonable [award] for the corrective disclosures negotiated by plaintiffs' counsel."[119]

Plaintiffs cite *Hollywood Firefighters' Pension Fund v. Malone* as support for their requested fee award.[120] In *Malone*, merger consideration was structured to give

---

[116] *Id.* at *33.

[117] *In re Medley Cap. Corp. S'holders Litig.*, C.A. No. 2019-0100-KSJM, at 30–31 (Del. Ch. Nov. 19, 2019).

[118] *Id.* at 31.

[119] *Id.* at 63.

[120] *See* D.I. 17 at Reply Br. 26–28.

outsized voting authority to the company's chairman and its CEO, and a stockholder vote was sought to afford *MFW* cleansing.[121] The negotiations resulted in an unfair price: "the Merger consideration for minority stockholders was inadequate while [the chairman] and [CEO] received unfair special benefits."[122] The stockholders were uninformed: the proxy failed to disclose management's voting power in the post-merger company.[123] And a member of the special committee, and its advisor, labored under undisclosed conflicts.[124] The plaintiffs obtained supplemental disclosures on those issues, as well as reorganization of the voting power carried by the merger consideration that "stripped [the company's chairman and its CEO] of [the] unique consideration they were to receive following the Merger."[125] The Court noted the disclosure benefits "dovetail[ed] with the overall 'gravamen' of the litigation: 'that the Merger consideration for minority stockholders was inadequate while [the chairman] and [the CEO] received unfair special benefits.'"[126] "The additional disclosure provided stockholders, whose majority-of-the-minority vote was still being sought, with pertinent information—regarding the process by which

---

[121] 2021 WL 5179219, at *2–3.

[122] *Id.* at *8.

[123] *Id.* at *3.

[124] *Id.* at *5.

[125] *Id.* at *5, *8.

[126] *Id.* at *8 (quoting the plaintiffs' reply brief).

Merger consideration was set—for their contemplation before casting their votes."[127]

The disclosure benefits were valued at $800,000, citing pre-*Trulia* authority, to reflect that the claims were "related to conflicts regarding financial advisors as well as special committee members."[128] The Court "adjusted to the low end of the scale" pre-*Trulia* because "the plaintiffs still viewed the revised disclosures as insufficient to fully inform [the company's] stockholders ahead of the vote."[129] That award was exceptional even pre-*Trulia*.[130]

In contrast, the disclosures Plaintiffs obtained are not exceptionally valuable. While stockholders were given more material information to guide their vote, nothing about these disclosures ameliorated any coercion, or altered the perception of whether the vote was a foregone conclusion.[131] Nor did they inform stockholders that the disclosed conflicts had any effect on the process. The disclosures did not expose an infected special committee or an unfair process that was dominated by

---

[127] *Id.*

[128] *Id.*

[129] *Id.* (citing *In re ArthroCare Corp. S'holder Litig.*, C.A. No. 9131-VCL, at 28).

[130] *See Sauer-Danfoss*, 65 A.3d at 1141 (including $800,000 fee awards and $1 million fee awards in the exceptionally valuable category, Appendix C).

[131] *See* Proxy at 130 (stating that "40.4% of the outstanding Falcon Common Stock" entered the Support Agreement and committed their "vote to approve the Proposals, which significantly reduces deal uncertainty," and, unlike in *Covetrus*, providing an accurate representation of deal certainty to stockholders).

28

Blackstone.[132] And, despite resolving informational gaps regarding the two financial advisors, the supplemental disclosures did not inform the stockholders that these advisors aided and abetted any breach of fiduciary duty.[133] While the stockholders plainly deserved to know about the potential conflicts held by the Transaction Committee's chair and advisors, the omitted conflicts are not alleged to have manifested in any deficiencies in the Merger's price or process, and the only alleged injury is that stockholders were deprived of their right to cast a fully informed vote.[134] The disclosures Plaintiffs achieved were material, but not exceptional.

### b. Meaningfully Beneficial Disclosures

And so, the disclosures Plaintiffs secured sink to the next stratum: the less defined space between a minimally beneficial $75,000 disclosure and a

---

[132] *See, e.g.*, D.I. 17 at Reply Br. 11–12 (addressing defendants' arguments that plaintiffs failed to show actual conflicts of interest existed or that there was any wrongdoing in the process by arguing the test for materiality does not require such a showing).

[133] *See, e.g.,* Compl. ¶¶ 44–50 (explaining the need to disclose the financial advisors' involvement with Blackstone so the stockholders may subjectively evaluate how much weight to place on such involvement).

[134] *See, e.g.*, D.I. 15 at Ans. Br. 10–11 ("Plaintiffs do not contend that the Merger was unfair to Falcon's stockholders; nor do Plaintiffs contend that the Merger was not in the best interests of Falcon's stockholders. Plaintiffs take no issue with any of the work conducted by Houlihan, Barclays, or Falcon's many other advisors; nor do Plaintiffs even quibble with any of Houlihan's fairness analyses or its conclusion that the transaction was fair from a financial perspective to Falcon. The Complaint alleges only that the directors breached their fiduciary duties by failing to disclose all material information, and the only alleged injury is that stockholders were deprived of their right to cast a fully informed vote.").

meaningfully beneficial disclosure capped at $450,000.[135]  One post-*Trulia* data point in this space is *In re Ebix Shareholder Litigation*, in which this Court found that "substantial" and "material," but "standard" and "not remarkable," disclosures merited a $400,000 award.[136]  The disclosure issues in *In re Ebix* began with multiple instances of underreporting of bloated director compensation.[137]  Those issues were mooted when the company terminated its compensation plan and replaced it with a new agreement; but the Form 8–K disclosure of that new agreement was allegedly deficient.[138]  That agreement was amended further in settlement, and the disclosures drawing the fee award described those amendments.[139]  Those disclosures did not concern any matter put to stockholder approval.[140]  The Court stated that the

---

[135] *Sauer-Danfoss*, 65 A.3d at 1136 (articulating a fee range for meaningful disclosures "such as previously withheld projections or undisclosed conflicts faced by fiduciaries or their advisors"); *Magellan*, 298 A.3d at 750 (identifying post-*Trulia* fee ranges for supplemental disclosures, with $75,000 to $125,000 serving as a benchmark for marginal disclosures, $450,000 serving as the high end for "material disclosures," and $600,000 being reserved for exceptional ones); *Bednar*, 2023 WL 3995121, at *5.

[136] *In re Ebix, Inc., S'holder Litig.* [hereinafter "*Ebix Tr.*"], C.A. No. 8526-VCS, at 101 (Del. Ch. Apr. 5, 2019) (TRANSCRIPT) (addressing plaintiffs' argument that the disclosures were substantial and deserved more than the standard range and declining to award above the standard $400,000 range).

[137] *See id.* at 84–86.

[138] *Id.* at 87; *see id.* at 88–89.

[139] *See id.* at 25; *see also id.* at 90; *id.* at 92.

[140] *See id.* at 93–94; *see also* Op. Br. 26, *In re Ebix, Inc., S'holder Litig.*, C.A. No. 8526-VCS (D.I. 70) (Del. Ch. Feb. 27, 2015) ("These five pages of disclosure ensure that stockholders will be provided with accurate information about the Settlement and operation of the Amended SARA.").

disclosures were "commendable," but they did not "justify a departure" from the typical fee award, which the parties agreed was $400,000.[141]

Here, Plaintiffs achieved four material supplemental disclosures informing a stockholder vote on what Falcon described as a potentially controlled transaction.[142] These multiple disclosures were more valuable than the *Ebix* disclosure.[143] And while the *Ebix* disclosure provided "more precise information about the incentive compensation" that the CEO may have received, the information disclosed was "not of massive proportions."[144] Here, the supplemental disclosures involved very

---

[141] *Ebix Tr.* at 101.

[142] *See* Proxy at 119–21 (explaining that the Transaction Committee was established where Blackstone was deemed to sit on both sides of the deal: "the Falcon Board had been made aware that certain affiliates of Blackstone may also be pursuing a potential transaction"; "the Transaction Committee suspended its activities, having been informed that there were no longer any active discussions relating to strategic transactions in which affiliates of Blackstone may have a conflict"; and "[g]iven Blackstone's ownership interests in Desert Peak, the Falcon Board then deemed it prudent to reactivate the Transaction Committee").

[143] *Continuum Cap. v. Nolan* [hereinafter "*Continuum I*"], C.A. No. 5687-VCL, at 42, 100–101 (Del. Ch. Feb. 3, 2011) (TRANSCRIPT) (discussing appropriateness of a greater fee award where plaintiffs obtain multiple good disclosures while balancing "the incremental value of the disclosure" and "the fact that [counsel] only had to litigate the case once . . . ."); *Continuum Cap. v. Nolan* [hereinafter "*Continuum II*"], C.A. No. 5687-VCL, at 40 (Del. Ch. Feb. 15, 2011) ("[I]f one meaningful quanta of information is obtained, the fee should be in the four to 500,000 range. And if there are two or more, the Court dials up.").

[144] *Ebix Tr.* at 93.

important potential conflicts of the committee chair[145] and financial advisors.[146] The disclosures concerned a merger transaction subject to a stockholder vote, which is a "fundamental [and] substantive" stockholder right.[147] And the disclosures were

---

[145] *See In re Loral Space & Commc'ns*, 2008 WL 4293781, at *22 (explaining that the role of a special committee chair, when done well, requires the chair to push back against the potential acquirer and controlling stockholder, and finding that the composition and effective functioning of the Special Committee was flawed because the selected chair was conflicted, and so poorly situated, to be a special committee chair); *see also In re Orchard Enters.*, 88 A.3d at 21 ("In controller transactions, the effective functioning of the Special Committee as an informed and aggressive negotiating force is of obvious importance to the public stockholders.").

[146] *See PAETEC*, 2013 WL 1110811, at *7 (classifying a "disclosure concerning the existence of a possible conflict for [company's] financial advisor" within meaningfully beneficial fee range "because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives [that entitled stockholders to] full disclosure of investment banker compensation and potential conflicts"); *see also Del Monte Foods*, 25 A.3d at 832 ("[T]his Court has required full disclosure of investment banker compensation and potential conflicts."); *John Q. Hammons Hotels*, 2009 WL 3165613, at *16 (emphasizing importance of disclosure of potential banker conflicts and explaining that "[t]here is no rule . . . that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict").

[147] *See Williams Co. S'holders Litig.*, 2021 WL 754593, at *20 (Del. Ch. Feb. 26, 2021) ("Modern corporate law recognizes that stockholders have three fundamental, substantive rights: to vote, to sell, and to sue."); *see also EMAK Worldwide*, 50 A.3d at 433 ("Shareholder voting rights are sacrosanct."); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 802 (Del. Ch. Jan. 3, 2022) ("Delaware courts regard a wrongful impairment by fiduciaries of the stockholders' voting power or freedom as causing a personal injury to the stockholders . . . ." (citing *Trenwick Am. Litig. Tr. v. Ernst & Young*, 906 A.2d 168, 212 (Del. Ch. Aug. 10, 2006) ("For this reason, our law has treated claims by stockholders that corporate disclosures in connection with a stockholder vote or tender were materially misleading as direct claims belonging to the stockholders who were asked to vote or tender.")).

acquired against the backdrop of misleading partial disclosures.[148]  While the *Ebix* plaintiffs achieved meaningful but "standard disclosures," the plaintiffs here achieved meaningful and "remarkable" disclosures, justifying a fee higher than *Ebix*'s $400,000.[149]

Another data point in this tier is *Bednar v. Cleveland Biolabs*, in which the Court found that two supplemental proxy disclosures relevant to fairness of price, paid in acquirer stock, warranted an aggregate fee of $450,000.[150]  Bednar received $175,000 for correcting false statements that stated the acquirer had conducted certain clinical trials, when no such trials had occurred.[151]  These disclosures "provided a material benefit to [company] stockholders deciding whether to approve a transaction in which they would receive [the acquirer's] stock."[152]  That award was

---

[148] *See FrontFour Cap.*, 2019 WL 1313408, at *29 ("Defendants violated their duties of disclosure" in part because they owed a duty to "provide the stockholders with an accurate, full and fair characterization of the events" once they "traveled down a road of partial disclosure"); *see also Clements v. Rogers*, 790 A.2d 1222, 1242 (Del. Ch. Aug. 14, 2001) ("When a Proxy Statement details the functioning of [the Special Committee], it must do so in a fair and balanced manner that does not create a materially misleading impression of how the Committee actually operated in fact.").

[149] *Ebix Tr.* at 101 (finding the disclosures achieved to be "standard disclosures" that warranted "the standard $400,000 fee for disclosures" and indicating that "remarkable" disclosures would "justify a departure from the fee typically awarded").

[150] 2023 WL 3995121, at *5.

[151] *Id.* at *2 ("[T]he supplemental disclosures deleted disclosures incorrectly stating that "three double-blind placebo-controlled Phase II clinical trials had been conducted of [acquirer's] drug candidate . . . .").

[152] *Id.* at *5.

set in view of the award in the related *Litwin v. Cleveland Biolabs* action, in which the plaintiffs were awarded $275,000 for corrective disclosures as to the acquirer's free cash flow for the same transaction.[153]  These cash flows were "the primary input that drives value" and were "the most important determinant" for the stockholder to make "an independent determination of fair value."[154]  There was no allegation that the *Bednar* or *Litwin* omissions were connected to any depression in the deal price.[155]  The *Bednar* Court concluded by noting "that the aggregate fee of $450,000 ($275,000 in the *Litwin* Action and $175,000 to Plaintiff here) [was] . . . on the high end of . . . the negotiated going rate for similar material disclosures post-*Trulia*."[156]

The disclosures in *Bednar* concerned information necessary for a stockholder to conduct an independent evaluation of the fairness of price.  Here, the disclosures concern information necessary for a stockholder to conduct an independent evaluation of the fairness of process.  With fair process and fair price being as intertwined as they are,[157]  I believe the aggregate $450,000 fee award in *Bednar* and

---

[153] *Id.*

[154] *Litwin v. Cleveland Biolabs*, C.A. No. 2021-0242-SG, at 5–6 (Del. Ch. Apr. 30, 2021) (TRANSCRIPT).

[155] *Id.* (explaining that the stockholders deserved to know the acquirer's omitted cash flow data provided by the acquirer; and determining that, while the company and financial advisor "deemed [the data] sufficiently reliable," the stockholders had a right to make an independent evaluation, especially when they were being offered the acquirer's stock).

[156] *Bednar*, 2023 WL 3995121, at *5.

[157] *Ams. Mining Corp.*, 51 A.3d at 1244.

*Litwin* is a helpful data point for process-related supplemental disclosures that are meaningfully beneficial.

And so, assessing the benefit supporting a fee award, without yet considering the other *Sugarland* factors, I value the multiple meaningfully beneficial disclosures of potential conflicts plaguing the purportedly independent Transaction Committee chair and advisors at a fee award of $450,000.

### c.   Minimally Beneficial

To round out the tour of the three tiers of material supplemental disclosures, this Court explored the minimally beneficial range in *Rodden v. Bilodeau*, where a disclosure told stockholders what the target's advisor had earned working for the acquirer in past engagements.[158]  The disclosed fees were fair and unremarkable.[159]  The Court concluded the supplemental disclosure was "material because its disclosure helped . . . stockholders to contextualize the magnitude of [the advisor's] potential conflict of interest," and awarded $75,000.[160]  It concluded the disclosures were less valuable than those in *In re Art Technologies*, where there was an imbalance between the acquirer and seller in their previous engagements with, and corresponding compensation to, the financial advisor.[161]  It concluded its disclosures

---

[158] C.A. No. 2019-0176-JRS, at 21, 24–25.

[159] *Id.*

[160] *Id.* at 16, 21.

[161] *Id.* at 25.

were more valuable than those drawing $50,000 in *In re Xoom Corporation Stockholder Litigation*, where there was a second, unconflicted advisor—there was no second advisor in *Rodden*.[162]

The disclosures obtained here were certainly more valuable than those in *Rodden*, *In re Art Technologies*, and *Xoom*. They colored the touted independence of a special committee's chair and advisors, on which stockholders were told they could rely. One of those advisors provided the committee with its fairness opinion; the other was simultaneously working for Blackstone in a relationship worth hundreds of millions of dollars. Those disclosures were more than minimally beneficial.

### 2. Secondary Factors

The secondary *Sugarland* factors "are comparatively straightforward to address."[163]

#### a. The Time And Effort Of Counsel

While "the real measure of a fee award lies in the results achieved,"[164] hours worked serves as a crosscheck to guard against windfall awards, "particularly in

---

[162] *Id.* at 23 (discussing *In re Xoom Corp. S'holder Litig.*, 2016 WL 4146425 (Del. Ch. Aug. 4, 2016)).

[163] *Malone*, 2021 WL 5179219, at *11.

[164] *Id.* at *6.

therapeutic benefit cases."[165]  "This factor has two separate but related components: (i) time and (ii) effort."[166]  As Plaintiffs acknowledge, their 155.53 hours of work was de minimis, and their effort in identifying and pursuing supplemental disclosures, in the absence of a hearing, discovery, or depositions, is not remarkable.[167]  This factor does not contribute to any additional fee.[168]

### b. The Complexity Of The Litigation

This case was not complex.  There are no groundbreaking topics.[169]  The straightforward nature of this case "does not merit adjusting the fee relative to deal litigation precedents."[170]

---

[165] *In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679, 692 (Del. Ch. July 31, 2023) (calculating the award by quantifiable benefit achieved and recognizing the hours worked cross-check is particularly helpful with therapeutic benefits:  "if the results are quantifiable, then *Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit.  Hours worked are considered as a crosscheck to guard against windfall awards, particularly in therapeutic benefit cases."); *Sciabacucchi v. Salzberg*, 2019 WL 2913272, at *1, *6 (Del. Ch. July 8, 2019).

[166] *Sciabacucchi*, 2019 WL 2913272, at *6 (citing *Sauer-Danfoss*, 65 A.3d at 1138).

[167] *Compare* Op. Br. 29, *with Magellan*, 298 A.3d at 750 n.81 (explaining that "the substantial work invested by the plaintiff's counsel" in *Covetrus* stood out as exceptional), *and with Covetrus Tr.* at 65 (finding plaintiffs spent a significant amount of time "research[ing] the facts and the issues of the case," filing a motion to expedite and reviewing "over 8,000 pages of documents in expedited discovery").

[168] *See, e.g., Continuum II* at 5 (noting that disclosures obtained after approximately a week of work and a month of work warranted the same fee range, but that the Court can exercise discretion when plaintiffs had done more work).

[169] *Magellan*, 298 A.3d at 751.

[170] *Sauer-Danfoss*, 65 A.3d at 1140.

### c. The Extent Of The Contingency Risk

Plaintiffs assert that "the contingent nature of the representation is the 'second most important factor considered by this Court' in awarding attorneys' fees"[171] and that "it is consistent with the public policy of Delaware to reward . . . risk-taking in the interests of shareholders."[172]  Plaintiffs are not incorrect.  But this coin has two sides. "Plaintiffs' counsel technically pursued this case on a contingent basis, but disclosure claims are relatively safe in terms of forcing a settlement."[173]  I will not penalize Plaintiffs for picking a low-hanging fruit.  I also will not reward them for it.[174]

Having filtered this case through the *Sugarland* factors, I find that Plaintiffs achieved meaningfully beneficial disclosures, without remarkable time, effort, or complexity that would warrant more compensation.  And so, I find a reasonable fee for the benefits that Plaintiffs have conferred amounts to an award of $450,000.

### III. CONCLUSION

Plaintiffs' counsel are entitled to a $450,000 fee award.

---

[171] Op. Br. 27 (citing *Dow Jones & Co. v. Shields*, 1992 WL 44907, at *2 (Del. Ch. Mar. 4, 1992)).

[172] *Id.* at 28 (citing *In re Plains Res. Inc. S'holders Litig.*, 2005 WL 332811, at *6).

[173] *Sauer-Danfoss*, 65 A.3d at 1140 (internal quotation marks omitted).

[174] *Id.* (finding the lack of risk does not provide any reason to depart from precedent awards, because the disclosure precedents involved comparable levels of contingency risk).